UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

GERALD GOODWIN, II,

                              Plaintiff,

   v.                                                     **DECISION AND ORDER**
                                                                          15-CV-105S

NANCY A. BERRYHILL,[1] *Acting
Commissioner of Social Security*,

                              Defendant.

1.     Plaintiff Gerald Goodwin, II challenges an Administrative Law Judge's ("ALJ") determination that he was not disabled within the meaning of the Social Security Act ("the Act") as of June 21, 2012. Goodwin alleges that he has been disabled since June 21, 2002, due to Juvenile Rheumatoid Arthritis ("JRA"), and that this disability continued after the redetermination of disability that took place when Goodwin attained age 18. He therefore asserts that he is entitled to payment of disability benefits under the Act.

2.     The Commissioner sent Goodwin an unfavorable Age 18 Redetermination Notice on June 21, 2012, in which Goodwin was determined to no longer qualify for Supplemental Security Income ("SSI"). (R. at 66-71.) Goodwin filed a Request for Reconsideration regarding his disability cessation on July 3, 2012. (R. at 72.) A Disability Hearing Officer found Goodwin no longer eligible for payments on March 4, 2013 (R. at 79-81), Goodwin then filed a written request for a hearing on April 24, 2013

---

[1] Nancy A. Berryhill became Acting Commissioner of Social Security on January 23, 2017. She is substituted for Carolyn W. Colvin as the Defendant in this action, under Rule 25(d) of the Federal Rules of Civil Procedure.

1

(R. at 92). Goodwin appeared and testified before Administrative Law Judge Timothy M. McGuan at a hearing held on September 12, 2013 in Buffalo, New York. (R. at 32.) Goodwin, his attorney, and an impartial vocational expert appeared and testified. (Id.) At the time of the hearing, Goodwin was 19 years old. (R. at 35.) On September 20, 2013, the ALJ issued a written decision concluding that Goodwin's disability ended on June 21, 2012, and that Goodwin has not become disabled again since that date. (R. at 20.) The Appeals Council subsequently denied Goodwin's request for review on December 8, 2014. (R. at 1-3.) Goodwin filed the current action on February 6, 2015, challenging the Commissioner's final decision.[2] (Docket No. 1.)

3. On June 19, 2015, Goodwin filed a Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket No. 5.) On September 17, 2015, the Commissioner filed a Motion for Judgment on the Pleadings. (Docket No. 9.) Goodwin filed a response to the Commissioner's brief, and in further support of Goodwin's Motion on November 9, 2015. (Docket No. 12.) For the following reasons, Goodwin's Motion is granted, Defendant's Motion is denied, and this case is remanded for further proceedings.

4. A court reviewing a denial of disability benefits may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will be reversed only if it is not supported by substantial evidence or there has been a legal error. See Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983); Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979). Substantial evidence is that

---

[2] The ALJ's February 6, 2015, decision became the Commissioner's final decision in this case when the Appeals council denied Plaintiff's request for review.

2

which amounts to "more than a mere scintilla," and it has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. See Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).

5. "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Williams on Behalf of Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial evidence may support Plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). In other words, this Court must afford the Commissioner's determination considerable deference, and will not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

6. The Commissioner has established a five-step sequential evaluation process to determine whether an individual is disabled under the Act. See 20 C.F.R. §§ 404.1520, 416.920. The United States Supreme Court recognized the validity of this analysis in Bowen v. Yuckert, and it remains the proper approach for analyzing whether

a claimant is disabled.  482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987).

> 7. This five-step process is detailed below:
>
> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.  Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam) (quotations in original); see also Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

8. Although the claimant has the burden of proof on the first four steps, the Commissioner has the burden of proof on the fifth and final step.  See Bowen, 482 U.S. at 146 n.5; Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984).  The final step is divided into two parts.  First, the Commissioner must assess the claimant's job qualifications by considering his physical ability, age, education, and work experience.  Second, the Commissioner must determine whether jobs exist in the national economy that a person having the claimant's qualifications could perform.  See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(f); Heckler v. Campbell, 461 U.S. 458, 460, 103 S. Ct. 1952, 1954, 76 L. Ed. 2d 66 (1983).

9.  In this case, the ALJ made the following findings with regard to the five-step process set forth above: (1) whether an individual has engaged in substantial gainful activity is not considered for redetermination of disability at age 18 (R. at 21);[3] (2) Goodwin's JRA was a "severe" impairment within the meaning of the Act, while his suppressed immune system was found to be a "non-severe" impairment (R. at 22); (3) since June 21, 2012, Goodwin did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (id.); (4) since June 21, 2012, Goodwin had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 CFR 416.967(a), except he can occasionally kneel, crawl, and climb ladders, ropes, and scaffolds (R. at 23); and (5) Goodwin has no past relevant work, but there are jobs that exist in significant numbers in the national economy that he can perform (R. at 25-26). Thus, the ALJ determined that Goodwin's disability ended on June 21, 2012, and he has not become disabled again since that date. (R. at 20.)

10.  Goodwin contends that the ALJ erred at Step Two by improperly considering Goodwin's "suppressed immune system" as a separate, non-severe impairment, rather than a symptom of JRA. In making an RFC determination, an ALJ may err at Step Two by considering various symptoms as separate impairments, and then determining these manufactured "impairments" to be non-severe. See Warren v. Astrue, No. 10-CV-500S, 2012 WL 32971, at *3 (W.D.N.Y. Jan. 6, 2012) (where the ALJ erroneously considered various symptoms allegedly caused by Claimant's treatment as impairments separate from her breast cancer). Courts have held that an error in

---

[3] Citations to the underlying administrative record are designated as "R."

determining the severity of impairments at Step Two is harmless when the ALJ finds at least one other severe impairment, and continues through the remaining steps in the disability analysis. Howard v. Comm'r of Soc. Sec., 203 F. Supp. 3d 282, 297 (W.D.N.Y. 2016). This is because the ALJ's duty to consider all of the relevant evidence calls for consideration of both severe and non-severe impairments at the RFC stage. Rivera v. Colvin, 592 F. App'x 32, 33 (2d Cir. 2015); Bellucco v. Colvin, No. 15-CV-6483P, 2016 WL 5334438, at *12 (W.D.N.Y. Sept. 23, 2016) (when determining a claimant's RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms") (quoting Stanton v. Astrue, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), aff'd, 370 F. App'x 231 (2d Cir. 2010)). However, if an ALJ errs at Step Two and subsequently fails to carefully consider all alleged impairments in the remainder of his or her analysis, the error cannot be considered harmless. Warren, 2012 WL 32971, at *10-11; compare Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) (matter not reversible where error did not affect the final decision).

11.     In this situation, the burden is on the plaintiff to show how the ALJ's overall analysis would have been affected by a proper factual consideration. Desmond v. Astrue, No. 11-CV-0818 VEB, 2012 WL 6648625, at *4 (N.D.N.Y. Dec. 20, 2012). Remand is necessary if there was a reasonable likelihood that the ALJ's determination would have been favorable to the claimant, but for the error. Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (evaluating whether the ALJ's consideration of a doctor's report would have changed the ALJ's adverse determination).

12. Goodwin argues that the ALJ failed to properly consider the evidence of his suppressed immune system in determining the RFC, and thus the finding was not based on substantial evidence. He contends that the record evidence demonstrates that he suffered from a compromised immune system, and establishes that his suppressed immune system is a symptom of JRA.

13. Goodwin was born on December 7, 1993. (R. at 144.) On June 21, 2002, Joan Calkins, M.D., treated Goodwin for JRA (R. at 256), for which she later prescribed the drug Enbrel to help alleviate his joint pain (R. at 272). Goodwin made frequent and regular visits to Dr. Calkins through 2012, with concerns of pain and various infections, for which he was prescribed associated medications. (R. at 255-413.) In addition, Dr. Calkins advised Goodwin to stop wearing a back pack, and recommended that he keep an extra set of school books at home. (R. at 267.) Dr. Calkins advised Goodwin's school to decrease his schedule to either four full days per week, or three full days and two half days. (R. at 274.) Despite Goodwin's adjusted school schedule, he missed a month of school in 2004 due to JRA. (R. at 292.) Goodwin continued to see Dr. Calkins for treatment related to JRA, including pain, stillness, intermittent immobility, and frequent infections.[4] While the prescription for Enbrel seemed to ease Goodwin's joint pain, he continued to suffer other symptoms of JRA, and made several emergency room visits in 2013 alone due to influenza and bacterial infections, for which he was

---

[4] While Goodwin was under Dr. Calkin's care, he was diagnosed (at least once) with pharyngitis, various fevers, upper respiratory infection, strep throat, tinea capitus, cellulitis of the scalp, back muscle spasms, sinusitis, asthma, bronchitis, chicken pox, epistaxis, varicella, influenza, tinea corpris, elevated liver enzymes, oral ulcers, mild depression, stomatitis--ulcerative, and folliculitis. In addition, Goodwin attended frequent appointments with Dr. Calkins regarding his joint pain. (R. at 257; 261; 263; 265; 267; 270-72; 277; 279; 284; 288; 300; 307-08; 314; 320; 325; 334; 328; 341; 361-63; 429-30; 435; 458; 472-77; 486.)

7

prescribed antibiotics.[5] On June 24, 2013, Goodwin began treatment with Karen Krutchick, M.D., at Rheumatology Consultants of Western New York. (R. at 445.)

14. While in school, Goodwin received a number of accommodations on account of JRA. In 2011, Goodwin's school Committee on Special Education ("CSE") evaluated him in an Individualized Education Program ("IEP") to better meet his needs. (R. at 130-143.) The IEP noted that Goodwin's JRA diagnosis "leads him to miss a lot of school," and accessibility modifications[6] were necessary to address his "significant medical needs." (R. at 138.) Similarly, Goodwin's 2012 IEP cited his JRA as the reason for his frequent absences, and allowed Goodwin special accommodations in school to manage his pain. (R. at 150.)

15. On June 14, 2012, Samuel Balderman, M.D., examined Goodwin as part of a consultative examination. (R. at 247.) Dr. Balderman diagnosed Goodwin with JRA and asthma, noted that Goodwin's "medications [were] controlling his arthritic symptoms well," and opined that he had "minimal to mild physical limitations." (R. at 249.) Dr. Balderman made no note or observation regarding Goodwin's immune system, other than the general diagnosis of JRA. (R. at 247-49.) On September 12, 2012, medical consultant Janis Dale, M.D., completed a Physical RFC Assessment. (R. at 414.) While Dr. Dale outlined Goodwin's exertional limitations,[7] the only reference to Goodwin's suppressed immune system is in her RFC conclusion, where she states that Goodwin is concerned that he "also has an impaired immune system *in addition to*

---

[5] Goodwin made ER visits on April 28, May 1, June 4, and August 6, 2013. (R. at 429, 435, 436, 482.)

[6] Including a modified workload, copies of class notes, additional time on exams, and restrictions on prolonged sitting and carrying heavy objects. (R. at 141.)

[7] Occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk 6 hours; sit six hours; push/pull unlimited; and, avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation. (R. at 494.)

8

rheumatoid arthritis," but notes that "there is nothing to substantiate allegation of limitations [due to] impaired immune system." (R. at 415) (emphasis added). Dr. Krutchick, Goodwin's treating physician, completed a Juvenile Rheumatoid Arthritis RFC Questionnaire on August 15, 2013. (R. at 494.) In addition to diagnosing Goodwin with JRA, and outlining his exertional limitations,[8] Dr. Krutchick also indicated Goodwin's limitations resulting from his numerous bacterial infections. (R. at 495.) As indicated in her RFC Questionnaire, when Goodwin used antibiotics, he tended to experience flu-like symptoms. (Id.) Goodwin would typically miss at least six days when he suffered a condition that required an antibiotic, and would be contagious for one to two days after he began the antibiotic regimen. (Id.) Lastly, Dr. Krutchick confirmed that Goodwin had been limited as stated since at least June 1, 2012. (Id.)

16. In the current case, the ALJ found in Step Two that Goodwin's JRA is a severe impairment, while his "suppressed immune system" is non-severe. (R. at 22.) According to the ALJ decision, this determination is based (at least in part) on the lack of a specific diagnosis in the record. (Id.) However, a suppressed immune system in this situation is not a separate impairment, but a symptom of JRA.[9] Therefore, it is not surprising that it was not recorded as a separate diagnosis. Goodwin's Motion cites to the Center for Disease Control and Prevention, discussing how rheumatoid arthritis affects the immune system, and increases the risk of illness and complications. (Docket

---

[8] Walk two city blocks without rest or severe pain; stand twenty minutes before needing to sit down; stand/walk two to four hours in an eight hour workday; occasionally lift/carry less than ten pounds; occasionally lift/carry ten pounds; rarely lift/carry twenty pounds; never lift/carry 50 pounds; significant limitations in doing repetitive reaching, handling or fingering; in an eight hour day, Plaintiff was limited to the following: grasp, turn, and twist objects with his hands 25 to 50%; fine manipulations with his right fingers 25 to 50 %; fine manipulations with his left fingers less than 25%; reach with his arms, including overhead, 25 to 50%. (R. at 494-95.)

[9] See Duncan v. Astrue, No. 09-CV-4462 KAM, 2011 WL 1748549, at *8 (E.D.N.Y. May 6, 2011) (discussing rheumatoid arthritis as an autoimmune disease).

9

No. 5.) The ALJ's finding that Goodwin's suppressed immune system was "non-severe" due to a lack of a specific diagnosis does not reflect a developed understanding of the record. The Commissioner does not dispute that Goodwin has JRA or that a suppressed immune system is a symptom of JRA, and seemingly concedes that a suppressed immune system is not a separate impairment. (Docket No. 9.) Instead, the Commissioner argues that the ALJ expressly considered these symptoms in the RFC finding, thus any error would be harmless. (Id.)

17. If the ALJ had properly considered Goodwin's compromised immune system in the RFC analysis, any error at Step Two might have been harmless. Rivera, 592 F. App'x at 33. However, the sole reference to Goodwin's suppressed immune system with respect to the RFC determination arises from testimony taken at Goodwin's hearing and relates to the ALJ's subsequent credibility finding. (R. at 23-25.) The ALJ mentioned that Goodwin "testified inconsistently with regard to his infection symptoms," referencing an April 2013 ER visit in which he was diagnosed with acute bronchitis. (R. at 25.) The ALJ supports this finding by stating that Goodwin was not treated for a bacterial infection, but this statement appears to be a mistake, as Goodwin *was* given an antibiotic on that visit, indicating that the doctor believed his lungs to be infected. (R. at 435.) Further, this analysis was used only as a basis for an adverse credibility finding, not as a basis for the RFC determination.

18. The record contains significant evidence that Goodwin suffered from frequent infections, including the 2011 IEP addressing his absences and Dr. Calkins' records regarding absenteeism due to illness, as well as Goodwin's testimony that he missed his college exams due to an infection. However, this evidence is not discussed

in the ALJ's decision and does not appear to have been a consideration with respect to the RFC determination. Indeed, the ALJ referenced only a single hospital report of infection, and appears to have misunderstood what took place during that visit. Therefore, the ALJ failed to carefully consider Goodwin's suppressed immune system in the remainder of his analysis, and the Step Two error cannot be considered harmless. Warren, 2012 WL 32971, at *10-11.

19.     In addition to challenging the ALJ's finding on Goodwin's suppressed immune system, Goodwin contends that the ALJ also erred by (1) failing to appropriately assess the medical source opinions in the record, including failing to fully consider Dr. Krutchick's opinion; and (2) improperly assessing Goodwin's credibility. The ALJ should evaluate and, if appropriate, address these points of error on remand.

20.     After carefully examining the administrative record, this Court finds cause to remand this case to the ALJ for further administrative proceedings consistent with this decision. Goodwin's Motion for Judgment on the Pleadings is therefore granted. Defendant's motion seeking the same relief is denied.

IT HEREBY IS ORDERED, that Plaintiff's Motion for Judgment on the Pleadings (Docket No. 5) is GRANTED.

FURTHER, that Defendant's Motion for Judgment on the Pleadings (Docket No. 9) is DENIED.

FURTHER, that this case is REMANDED to the Commissioner of Social Security for further proceedings consistent with this decision.

FURTHER, that the Clerk of Court is directed to close this case.

SO ORDERED.

Dated:   August 9, 2017
         Buffalo, New York

                                                    /s/William M. Skretny
                                                   WILLIAM M. SKRETNY
                                                   United States District Judge